# EXHIBIT A-2

CAUSE NO. _____   2024-05-35547-CV

| | |
|---|---|
| **OSCAR ORONA IANF of N.O.,** *a minor,* **CRISTINA OLIVAREZ IANF of K.O.,** *a minor,* **ANGELICA RODRIGUEZ IANF of L.G.,** *a minor,* **JOSE FLORES, Individually and as Representative of the Estate of J.F., Jr.,** *deceased;* **MANUEL LOZANO, individually; LYLIANA GARCIA, individually; ALEJANDRO GARCIA, Individually and as Representative of the Estate of IRMA GARCIA,** *deceased;* **and ELSA AVILA.** | **IN THE DISTRICT COURT** |
| *Plaintiffs* | **38th JUDICIAL DISTRICT** |
| **v.** | |
| **DANIEL DEFENSE, LLC; DANIEL DEFENSE HOLDINGS, LLC; M.C. DANIEL GROUP, INC; FIREQUEST INTERNATIONAL, INC.; FLASH CO., INC.; EOTECH, LLC; PROJECT ECHO HOLDINGS, LLC D/B/A AMERICAN HOLOPTICS; KOUCAR MANAGEMENT, LLC; OASIS OUTBACK, LLC.** | **UVALDE COUNTY, TEXAS** |
| *Defendants* | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs, **OSCAR ORONA** Father and Next Friend of **N.O.**, a *minor*, **CRISTINA OLIVAREZ** Mother and Next Friend of **K.O.**, a *minor*, **ANGELICA RODRIGUEZ** Mother and Next Friend of **L.G.**, a *minor*, **JOSE FLORES** Individually as Wrongful Death Beneficiary and as Representative of the Estate of J.F., Jr., *deceased minor*, **MANUEL LOZANO**, Individual Wrongful Death Beneficiary of **IRMA GARCIA**, and **ALEJANDRO GARCIA**, Individual Wrongful Death Beneficiary and Representative of the Estate of **IRMA GARCIA, LYLIANA GARCIA**, Individual Wrongful Death Beneficiary of **IRMA GARCIA** and **ELSA AVILA**, by and

1

Copy from re:SearchTX

through their attorneys, state as follows for their Complaint against Defendants, **DANIEL DEFENSE, LLC; DANIEL DEFENSE HOLDINGS, LLC; M.C. DANIEL GROUP, INC; FIREQUEST INTERNATIONAL, INC.; FLASH CO., INC.; EOTECH, LLC; PROJECT ECHO HOLDINGS, LLC D/B/A AMERICAN HOLOPTICS; KOUCAR MANAGEMENT, LLC; OASIS OUTBACK, LLC**.

## INTRODUCTION AND FACTUAL BACKGROUND

1. On May 24, 2022, the community of Uvalde and particularly these assembled Plaintiffs became victim to the latest in a long line of mass shootings on school campuses. Starting with Columbine High School in 1999 (13 dead), Virginia Tech in 2007 (33 dead), Sandy Hook Elementary in 2012 (26 dead), Marjory Stoneman Douglas High School in 2018 (17 dead) and Santa Fe High School in El Paso in 2018 (10 dead) schoolhouses have become a primary target for deranged individuals with access to weapons and motivation to enact such horrific acts of violence. On May 24, 2022, Salvador Ramos became the latest of those thoughtless killers and took the lives of 17 minor children and two adult teachers in 4th Grade classes at Robb Elementary in Uvalde, Texas.

2. Without warning, Salvador Ramos (the "Shooter") opened fire to children and teachers who had no body armor and no weapons, with approximately two thousand rounds of 5.56mm ammunition.

3. Several of the rounds fired from one or more AR-15 weapons shredded through the plaintiffs, critically injuring them.

4. The mass shooting at Robb Elementary School (the "Shooting") was the foreseeable and entirely preventable result of a chain of events initiated by Daniel Defense, LLC; Daniel Defense Holdings, LLC; M.C. Daniel Group, Inc.; Firequest International, Inc.; Flash Co.,

Copy from re:SearchTX

Inc.; EOTech, LLC; Project Echo Holdings, LLC d/b/a American Holoptics; Koucar Management, LLC; Oasis Outback, LLC.

5.  For years, these manufacturers have deceptively and unfairly marketed their assault rifles, rifle accessories, and ammunition in ways designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males—the same category of consumers Defendants have watched, time after time, commit the type of mass shooting that unfolded again at the Robb Elementary School.

6.  The Defendants employ sales and marketing practices that create and feed a consumer base of young, civilian men who keep the money rolling in by purchasing not only the rifles, but all the deadly accessories that go with them—ammunition, body armor, optics, high-capacity magazines, silencers, and laser-aiming devices, among others. When these consumers foreseeably use Defendants' assault rifles, and rifle accessories, in mass shootings, the families and communities affected suffer while Defendants celebrate boosts to their bottom lines. Defendants know that demand for their weapons, and weapon accessories, increase in the aftermath of mass shootings. Rather than behave responsibly, Defendants stoke fear of gun regulations and encourage stockpiling after shootings to increase that demand.

7.  The marketing and sales practices of Defendants and other entities within the gun industry—including their practices in the State of Texas—are the beginning and pivotal links in a foreseeable and predictable chain of events resulting in many mass shootings in America each year. With full knowledge and appreciation of their role in facilitating these mass shootings, Defendants continue to intentionally and recklessly advertise, market, promote, and sell a warrior mentality that a certain subset of youths. Defendants have not taken even the simplest steps to prevent or discourage young, impulsive would-be mass shooters from

3

acquiring their weapons, weapon accessories, and ammunition and using them to inflict harm, such as implementing age gates on their social media accounts to align with any state and local regulations governing the age at which a person could purchase or use the relevant products, warning consumers about the dangers of assault rifles, or even avoiding advertising illegal modifications to and uses of weapons. Defendants' practices are negligent and unlawful.

8.  After years of conditioning by perverse and pervasive marketing by Defendants and the gun industry at large, would-be mass murderers—like the Shooter—naturally look to obtain the products associated with the idolized self-sufficient warrior mentality featured by these promotions.

9.  At age 17, Ramos attempted to convince at least two friends or family members to affect a straw purchase of a firearm for him.  Both, refused. But his desire to purchase firearms was well established.

10. Prior to his 18th birthday Ramos began purchasing and stockpiling ammunition which would ultimately be used in this tragic event.

11. Prior to his 18th birthday Ramos reached to Daniel Defense and the other defendants to begin the purchase of his weapons and accessories.

12. The sale started prior to his 18th birthday and within one hour after midnight on his 18th birthday, Ramos went online to the Daniel Defense website and completed the sale of two AR-15 pattern rifles and an additional 1,000 rounds of 5.56mm hollow-point ammunition. This was done in the early morning hours of May 16, 2022. This rifle was shipped a day later to the Defendant Oasis Outback.

13. On May 17, 2022, Ramos purchased a Smith and Wesson Volunteer series rifle. This rifle was  purchased from Defendant Oasis Outback in Uvalde, Texas.

4

Copy from re:SearchTX

14. On May 20, 2022, the first rifle, a Daniel Defense DDM4-V7, purchased directly from Daniel Defense, arrived by mail to Oasis Outback for completion of the ATF-mandated transfer paperwork.  Ramos paid Oasis to install a sight onto the DDM6-V7 rifle and the work was performed at the time of transfer.

15. The Defendant Daniel Defense, LLC's DDM4 V7 rifle, was the exact same AR-15 rifle that was used by another violent young man just over a month earlier to conduct a mass shooting at Edmund Burke School, in Northwest Washington.

16. Altogether, and within the space of a few days, Ramos had amassed two rifles and approximately two thousand rounds of 5.56mm ammunition. Prior to his 18th birthday and in the few days thereafter Ramos also purchased firearm accessories from the Defendants Firequest International, Inc.; Flash Co., Inc.; EOTech, LLC; Project Echo Holdings, LLC d/b/a American Holoptics; Koucar Management, LLC. These accessories included devices which turned the rifles in to rapid fire machine guns. Ramos purchased one of Firequest's Hellfire trigger modifications that was used on the Daniel Defense rifle during his rampage.

17. Once his arsenal of choice was amassed and assembled, the Shooter transported the weapons made by Defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; M.C. Daniel Group, Inc.; Firequest International, Inc.; Flash Co., Inc.; EOTech, LLC; Project Echo Holdings, LLC d/b/a American Holoptics; Koucar Management, LLC; Oasis Outback, LLC. to the Robb Elementary School to execute the Shooting.

18. For years, Defendants and other entities in the gun industry have, through their misconduct and illegal practices, profited off the actions of disturbed young men like Ramos. They offer for sale these weapons to these young men, advertising them as weapons of war to be used to kill people. They willfully ignored the public's right to be safe from violence by placing weapons and other tools of war into the Shooter's hands. They must be held accountable.

5

Copy from re:SearchTX

19. Each Defendant enabled Ramos to carry out the carnage. They knowingly sought to place their weapons, accessories, and ammunition in the hands of disturbed young men by targeting and exploiting the risk-seeking—and often troubling—desires of these consumers. Ramos and other would-be mass shooters are highly susceptible to disturbing promotional messages, which foreseeably feed the desires of these young men to act out their militaristic fantasies on a civilian population.

## DISCOVERY LEVEL

20. Discovery shall be conducted in this case according to Level III discovery control plan.

## THE PARTIES

**PLAINTIFFS**

21. Plaintiff **Oscar Orona**, Individually and as Next Friend of Plaintiff, **N.O.**, his son, a *minor* who was ten years old, are residents of Texas. **N.O.** is a victim of the Shooting at Robb Elementary School on May 24, 2022. He was a fourth-grade student at Robb Elementary School at the time of the Shooting, and sheltered in place for hours in its aftermath. **N.O.** suffered, and continues to suffer, severe emotional distress stemming from the Shooting.

22. Plaintiff **Cristina Olivarez**, Individually and as Next Friend of Plaintiff, **K.O.**, her daughter, a *minor* who was nine years old, are residents of Texas. **K.O.** is a victim of the Shooting at Robb Elementary School on May 24, 2022. She was a fourth-grade student at Robb Elementary School at the time of the Shooting, and sheltered in place for hours in its aftermath. **K.O.** suffered, and continues to suffer, severe emotional distress stemming from the Shooting.

6

Copy from re:SearchTX

23. Plaintiff **Angelica Rodriguez**, Individually and as Next Friend of Plaintiff, **L.G.**, her daughter, a *minor* who was ten years old, are residents of Texas. **L.G.** is a victim of the Shooting at Robb Elementary School on May 24, 2022. She was a fourth-grade student at Robb Elementary School at the time of the Shooting, and sheltered in place for hours in its aftermath. **L.G.** suffered, and continues to suffer, severe emotional distress stemming from the Shooting.

24. Plaintiff **Jose Flores**, Individually as Wrongful Death Beneficiary and as representative of the estate of **J.F. Jr.**, his son, a *deceased minor* who was nine years old. **Jose Flores** is, and **J.F. Jr.** was, a resident of Texas. **J.F. Jr.** was a victim of the Shooting who was shot multiple times at Robb Elementary School on May 24, 2022. He was a fourth-grade student at Robb Elementary School at the time of the Shooting, and sheltered in place for hours in its aftermath.

25. Plaintiff **Manuel Lozano**, a Texas resident, Individually as Wrongful Death Beneficiary of **Irma Garcia**, his daughter, *deceased*. **Irma Garcia** was a victim of the Shooting who was shot multiple times at Robb Elementary School on May 24, 2022. She was a teacher at Robb Elementary School at the time of the Shooting, and sheltered in place for hours in its aftermath.

26. Plaintiff **Alejandro Garcia**, is the son of **Irma Garcia**, *deceased*, Individually as Wrongful Death Beneficiary and as representative of the estate of **Irma Garcia**. He is a resident of the State of Texas.

27. Plaintiff **Lyliana Garcia**, is the daughter of **Irma Garcia**, *deceased*, Individually as Wrongful Death Beneficiary of **Irma Garcia**. She is a resident of the State of Texas.

28. Plaintiff **Elsa Avila**, was teaching at Robb Elementary on May 24, 2022 and sheltered in place for hours in its aftermath. She is resident of the State of Texas.

Copy from re:SearchTX

**DEFENDANTS**

29. Defendant **Daniel Defense, LLC** is a firearms manufacturer and a foreign limited liability company duly organized pursuant to the laws of the State of Georgia that does business throughout the United States, including conducting business in Texas. Daniel Defense, LLC is a firearms manufacturer founded as a limited liability company in the state of Georgia. Daniel Defense, LLC's corporate headquarters are located at 101 Warfighter Way, Black Creek, Georgia 31308. Daniel Defense was founded by Marvin "Marvin" Daniel. Today, Marvin Daniel is Executive Chairman of Daniel Defense's board. He served as CEO until February 2023. Daniel Defense does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Daniel Defense, LLC, 101 Warfighter Way, Black Creek, Georgia 31308 and to its Registered Agent in its state of organization, Marvin Daniel at 101 Warfighter Way, Black Creek, GA 31308. Service is requested at this time.

30. Defendant **Daniel Defense Holdings, LLC** is the sole member of Defendant Daniel Defense, LLC. Daniel Defense Holdings, LLC is a foreign limited liability company duly organized pursuant to the laws of the State of Delaware that does business throughout the United States, including conducting business in Texas. Daniel Defense Holdings, LLC does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Daniel Defense Holdings, LLC, 101 Warfighter Way, Black Creek, GA 31308  and to its Registered Agent in its state of

8

Copy from re:SearchTX

organization, Advanced Corporate Agent Services, Inc. at 614 N Dupont Hwy Suite 210, Dover DE 19901. Service is requested at this time. Daniel Defense Holdings, LLC's majority member is M.C. Daniel Group, Inc., a Georgia corporation. Upon information and belief, Daniel Defense Holdings, LLC's minority member is David Phelps, a citizen and resident of Texas.

31. Defendant **M.C. Daniel Group, Inc.** is the majority member of Defendant Daniel Defense Holdings, LLC. It is a foreign corporation duly organized pursuant to the laws of the State of Georgia that does business throughout the United States, including conducting business in Texas. M.C. Daniel Group, Inc. es not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: M.C. Daniel Group, Inc., 107 Wild Turkey Lane, Pooler, Georgia 31322 and to its Registered Agent in its state of incorporation, Marvin Daniel at 101 Warfighter Way, Black Creek, GA 31308. Service is requested at this time.

32. Collectively, Defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc. are referred to in this Petition as **"Daniel Defense."** Daniel Defense manufactures, markets, and sells AR-15s. Daniel Defense manufactured, marketed, and sold the AR-15 DDM4v7 rifle to young men under the age of 18 and which was used by a barely 18-year-old kid no more than 140 pounds and 5'6" to slaughter, maim, and terrorize children and teachers for 77 minutes, and to hold down and paralyze 376 heavily armed police officers for 77 minutes, at Robb Elementary School on May 24, 2022.

33. Defendant **Firequest International, Inc.** is a foreign corporation duly organized pursuant to the laws of the State of Arkansas that does business throughout the United States, including

9

Copy from re:SearchTX

conducting business in Texas. Firequest International, Inc. does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Firequest International, Inc., 505 East 5th St., El Dorado, Arkansas 71730 and to its Registered Agent in its state of incorporation, Lisa McCuistion at 505 East 5th St., El Dorado, AR 71730. Service is requested at this time.

34. Firequest International, Inc. manufactures firearms accessories, such as the Hell-Fire Gen 2 snap-on trigger system purchased by the Shooter, which allow semi-automatic rifles to fire more rapidly, similar to automatic weapons. Upon information and belief, Firequest International, Inc. has an ownership stake in, and exercises control over, the domains firequest.com, hellfire.systems, rockinlock.com, and rapidfiretriggers.net.

35. Defendant **Flash Co., Inc.** is a foreign corporation duly organized pursuant to the laws of the State of Colorado that does business throughout the United States, including conducting business in Texas. Flash Co., Inc. does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Flash Co., Inc., 236 S. 3rd St. PMB 206 Montrose, Colorado 81401 and to its Registered Agent in its state of incorporation, Vincent Troncoso at 236 South 3rd St., Suite 206, Montrose, CO 81401. Service is requested at this time. Upon information and belief, Defendant Flash Co., Inc. has an ownership stake in, and exercises control over, the domains hellfire.systems, rockinlock.com, rapidfiretriggers.net, and firequest.com.

10

Copy from re:SearchTX

36. At all relevant times, the websites for domains hellfire.systems, and rapidfiretriggers.net, listed Defendant Flash Co. Inc. as the contact point for visitors interested in purchasing Hell-Fire trigger systems.

37. At all relevant times, rockinlock.com listed the phone number for Defendant Flash Co., Inc. as the contact point for visitors interested in purchasing a Hell-Fire Gen 2 snap-on trigger system.

38. On the website hellfire.systems, Defendant Flash Co., Inc. claims to control "//Hellfire.systems/   //rockinlock.com/   //rapidfiretriggers.net/   firequest.com." hellfire.systems directs customers to firequest.com for "special wholesale pricing."

39. Collectively, defendants Firequest International, Inc. and Flash Co., Inc. are referred to in this Petition as "**Firequest**."

40. Defendant **EOTech, LLC** is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan that does business throughout the United States, including conducting business in Texas. EOTech, LLC does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: EOTech, LLC, 46900 Port St., Plymouth, Michigan 48170 and to its Registered Agent in its state of organization, Joseph Caradonna at 905 W. Maple Rd., Clawson, MI 48017. Service is requested at this time.

41. Defendant Project Echo Holdings, LLC d/b/a American Holoptics is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan that does business throughout the United States, including conducting business in Texas. Project Echo Holdings, LLC is the parent company of EOTech, LLC. Project Echo Holdings, LLC does not appear to

11

actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Project Echo Holdings, LLC d/b/a American Holoptics, 905 W. Maple Rd., Clawson, MI 48017 and to its Registered Agent in its state of organization, Joseph Caradonna, 905 W. Maple Rd., Clawson, MI 48017. Service is requested at this time.

42. Defendant **Koucar Management, LLC** is a foreign limited liability company duly organized pursuant to the laws of the State of Michigan. Koucar Management, LLC operates under the following assumed names: Koucar Industries; Koucar International; and Koucar Worldwide. Koucar Management, LLC is the parent company of Project Echo Holdings, LLC d/b/a American Holoptics. Koucar Management, LLC does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044. The Secretary of State should send this pleading to: Koucar Management, LLC d/b/a Koucar Industries, Koucar International and Koucar Worldwide, 905 W. Maple Road, Clawson, MI 48017 and to its Registered Agent in its state of organization, Joseph Caradonna, 905 W. Maple Road, Clawson, MI 48017. Service is requested at this time.

43. Collectively, Defendants EOTech, LLC; Project Echo Holdings, LLC; and Koucar Management, LLC are referred to in this Petition as **"EOTech."** EOTech manufactured, marketed, sold, and shipped a holographic battle sight to Ramos in Texas. These accessories were part of the equipment he gathered and used in his rampage.

44. Defendant **Oasis Outback, LLC** ("Oasis Outback") is a limited liability company formed in the state of Texas. It is a gun store with a principal place of business at 2900 E. Main St.

Copy from re:SearchTX

Uvalde, Texas 78801. It may be served with process by serving its registered agent, William

R. Klein, at 236 East Nopal Street, Uvalde, TX 78801. This Defendant facilitated the sales

of these firearm purchases and acted as the agent of Daniel Defense to finalize these sales.

## JURISDICTION AND VENUE

45. Venue is proper in Uvalde County, Texas, pursuant to §15.001 of the TEXAS CIVIL PRACTICE &

REMEDIES CODE as all or a substantial portion of the events made the basis of this lawsuit

occurred in Uvalde County, Texas.

46. This Court has jurisdiction over the parties named herein because Defendants are residents

and citizens of the State of Texas and/or routinely and regularly conduct business in this

State.

47. This is a cause of action for money damages within this Court's jurisdiction.

48. Pursuant to Rule 47 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs seek monetary

relief OVER ONE MILLION DOLLARS ($1,000,000.00), which is in excess of the minimum

jurisdictional limits and a demand for judgment for all the other relief to which Plaintiffs deem

themselves justly entitled at the time of filing this suit, which, with the passage of time may

change and is within the Court's jurisdictional limits. Because Rule 47 of the TEXAS RULES

OF CIVIL PROCEDURE requires Plaintiffs to affirmatively plead the amount of damages

sought, Plaintiffs plead that any amount in excess of ONE MILLION DOLLARS

($1,000,000.00) in an amount to be determined by the jury.

## GENERAL ALLEGATIONS

**Defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; M.C. Daniel Group, Inc.; Firequest International, Inc.; Flash Co., Inc.; EOTech, LLC; Project Echo Holdings, LLC d/b/a American Holoptics; Koucar Management, LLC; Oasis Outback, LLC Design and Market Weapons of War to Civilians**

**a. The Evolution of the Assault Weapon**

13

Copy from re:SearchTX

49. The assault rifles manufactured and promoted by Defendants Daniel Defense, Firequest, EOTech, and Oasis Outback to consumers like Ramos have military origins. They were originally designed to kill as many people as possible as quickly as possible. Even today, Defendants Daniel Defense, Firequest, EOTech, and Oasis Outback promote these rifles to civilians who fantasize about military- style combat.

50. During World War I, infantry soldiers were generally equipped with long-range battle rifles, which did not meet the needs of the trench warfare that characterized that war. As a result, countries began developing more compact, fast-firing weapons, such as the submachine gun. By World War II, the German military had developed the StG 44, also known as the "storm gun," and the "father of all assault rifles," because "[a]fter the war it was examined dissected by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles." [Violence Policy Center, Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle Used in the LAX Shooting at 10 (Nov. 2013) (citation omitted)]

51. The first AR-15 rifles were designed in 1957 by Armalite, a small arms engineering company, for the U.S. military.["AR" stands for "Armalite Rifle] Armalite's goal was to create a lightweight portable select-fire rifle that would allow soldiers to quickly put many rounds on target from distances of a quarter mile or more. [A fully automatic rifle fires continuously as long as the trigger is held down. A semiautomatic rifle fires one round for each trigger pull, and then automatically reloads the chamber with the next round. A select-fire rifle can fire in either fully automatic or semiautomatic mode] Thus, the AR-15 was designed to be effective in combat and to kill or disable as many enemy soldiers as possible as quickly as possible, even from far away. Although Armalite developed the first AR-15, today the term "AR-15" designates the type of the firearm, rather than the brand.

Copy from re:SearchTX

52. Armalite's 56.  Armalite's design performed so well that the U.S. military concluded that a five- or seven-man squad armed with AR-15s (known within the military as M16 rifles) had as good or better "hit-and-kill potential" in combat-style tests than an 11-man squad armed with older, select- fire M14 rifles. In fact, the U.S. Army directs that semiautomatic mode, rather than automatic fire, be used for virtually all purposes, because it is more effective and lethal. The Army has concluded that "[a]t ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and even time to hit." [U.S. Dep't of Defense, Operate Your Rifle Like a Pro: U.S. Army Official Manual, at Chapter 7, Section II, 7–8 (2017)]

53. The distinctive appearance of assault weapons is the result of the gun's functional design. Assault weapons "have incorporated into their design specific features that enable shooters to spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger." [Violence Policy Center, supra note 2, at 10–11] These design features make assault weapons particularly lethal.

54. In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machinegun to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination of parts from which a machinegun can be assembled" if those "parts are in the possession or under the control of a person." *Id.* It is a crime to possess or transfer machine guns to any person

15

Copy from re:SearchTX

who has not undergone the required registration and authorization process. See 18 U.S.C. § 922(b)(4) § 922(o)(1).

55. Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machine guns" under the NFA. [ATF Ruling 82-2; ATF Ruling 82-8] That is, even if a gun was not originally a machine gun, it qualifies as one under the NFA if it can be simply modified into one.

56. In 1994, Congress further acted to limit civilians' access to these weapons by passing a federal assault weapon ban, which sunset in 2004.

57. As the federal assault rifle ban lapsed in 2004, the gun industry saw an opportunity to market these weapons of war to civilians.

**Defendants Intentionally, Unfairly, and Deceptively Use Militaristic Messaging and Unrealistic Concerns About Combat to Market to Civilians, Including Teens and Young Adults.**

58. Despite knowing that mass shootings have been repeatedly perpetrated by young men armed with assault rifles, Defendants specifically and intentionally market their weapons, ammunition and weapon accessories in ways that appeal to adolescent and post-adolescent males, including through video game, social media and invocations of other brands geared toward children and young adults. They have taken no steps to guard against the sale of their weapons, and weapon accessories to those who would foreseeably commit such violent acts. They intentionally target these young males with advertisements that encourage violence.

59. Defendants' advertisements suggest that their weapons, ammunition and weapon accessories, are ready for active combat in war, but also appropriate for civilians to use for offensive combat-like missions. For example, according to the Oversight and Reform Committee of

16

the U.S. House of Representatives, "Ninety percent of [Defendant Daniel Defense]'s sales are direct to civilian consumers, but the company's marketing emphasizes the tactical nature of its products." [Memorandum re: Committee's Investigation into Gun Industry Practices and Profits, 116 Cong. H. Comm. Oversight & Reform (2022]

60. These advertisements are especially salient for—and are targeted to attract— troubled young men attracted to violent combat, increasing the risk that these young men will use Defendants' deadly weapons, weapon accessories, and ammunition to perpetrate mass violence. This includes Ramos who actively engaged in playing Call of Duty where Daniel Defense weapons were advertised and used in the game.

61. Defendant Daniel Defense regularly promotes its weapons and accessories by suggesting that its rifles will enable its primarily civilian consumers to engage in combat operations. It does so through print, Facebook, and Instagram advertisements, among others, that feature imagery of combat soldiers in the field of war, and men in military fatigues with the caption, "Saturdays are for the boys." All of these advertisements encourage civilians, and particularly "boys" and young men like the Shooter, to reenact military-style exercises with Daniel Defense's weapons. And Defendant Daniel Defense specifically uses hashtags to appeal to impressionable and violent young men like the Shooter, including #gunporn and #cqbr (i.e., "close quarter battle receiver," an adaptation of the M4 rifle used by the military in close combat), while promoting its rifles for everyday use with captions like "MK18 Monday.

17

Copy from re:SearchTX



*Image from Daniel Defense 2022 Print Catalog*



*Daniel Defense Facebook Advertisement (March 13, 2021)*

18

Copy from re:SearchTX

## Daniel Defense MK Rifles



**FILTER BY** clear all ×

In Stock
Show Only In-Stock

Product Type
Receiver
Rifles

Barrel Length:
10.1-15"
15.1-20"

**Daniel Defense MK Rifles** include the AR-style MK12 and MK18 rifles. The **MK12** semi-automatic precision rifles were designed and manufactured to meet the needs of Special Operations Forces. The short-barreled **MK18** rifle was rigorously tested before being used by the USSOCOM for CQB operations. Both rifle models are available in 5.56 NATO.

*Daniel Defense Mk rifle advertised that it was designed to meet the needs of special forces.*

62. Daniel Defense also negligently designs and manufactures its rifles, including the one used by Ramos to allow them to be turned into automatic machine guns. With the knowledge that these accessories are out there and are being used to turn their rifles into automatic machine guns, Daniel Defense takes no steps to design their rifles to prevent these modifications.

63. Defendants Firequest and Flash Co developed and markets the Hellfire Trigger device purchased by Ramos and used on this Deniel Defense rifle during the rampage. This device is placed in the handgrip of the rifle and is used to turn the rifle into a machine gun for rapid fire. This is described in the below Firequest video:

19

Copy from re:SearchTX



HELLFIRE STEALTH 32619

6 years ago :: More

 MR TRIGGERMAN   + Follow

Customize the
look and feel of
your player



Hellfire GEN 2 Compilation w/one hand

 MRTRIGGERMAN      Subscribe
9.69K subscribers

👍 Like   👎   ↗ Share   ⤓ Download   ☰+ Save   ...

64. Defendants' strategies are designed to exploit adolescents' and young adults' attraction to

impulsive, thrill-seeking behavior and their insecurities about their futures. And they are

eerily reminiscent of the historical practices of the tobacco and alcohol industries, other

Copy from re:SearchTX

industries that have exploited young consumers' vulnerability by designing advertisements that promote thrill-seeking and self-esteem inflating conduct in order to hook them early and convert them into lifelong purchasers of their products.

65. Defendants also make blatant appeals to youth and young adults by using graphic novel and video game-like imagery in their advertisements and by plainly featuring children and toys in their advertisements.

66. For example, Defendant Daniel Defense promotes its rifles' placement in violent video games geared towards young men like Ramos, who are particularly susceptible to be influenced by violent imagery. The Daniel Defense DDM4 V7S rifle—a short-barreled version of the Shooter's DDM4 V7—is featured in *Call of Duty: Modern Warfare*, and the company's social media advertisements specifically reference *Call of Duty* and the hashtags #callofduty and #cod in posts.



*Daniel Defense Facebook Advertisement (October 25, 2019)*

21

 

67. Video games like *Call of Duty* give young men like Ramos the opportunity to simulate the experience of shooting at others in a theater of war, using AR-15 rifles styled after those made by Defendant Daniel Defense and others. Defendant Daniel Defense's joint advertising with *Call of Duty* enables it to reach countless young men who gravitate towards realistic reenactments of violent warfare. Video games like *Call of Duty* have been attractive to several young men who have committed mass shootings—including at Sandy Hook and Parkland, and in Uvalde and El Paso. Ramos actively played *Call of Duty* prior to this rampage.

68. Defendant Daniel Defense also routinely promotes advertisements that blend its violent weaponry with well-known pop culture references to ensure its advertising is attractive to young men who are particularly susceptible to these deceptive marketing practices.

22

Copy from re:SearchTX



Daniel Defense Twitter Advertisement (October 31, 2021)

69. This includes posting an image of its MK18 AR-15 rifle with popular musician Post Malone,
    again with the #gunporn hashtag to broaden its advertisement's reach.

Copy from re:SearchTX



*Daniel Defense Instagram Advertisement (January 23, 2020)*

70. Daniel Defense even directly markets their firearms showing them in the hands of small children:



24

71. To market their weapons, weapon accessories, and ammunition, Defendants maintain an active presence on social media, through platforms such as Twitter, Instagram, Facebook, and YouTube. Notably, they do not include any legal or regulatory disclosures on their social media accounts, including any warnings about the dangers of assault rifles.

72. Further, EOTech actively markets its sights as weapons of war and how they are used in combat. They are also featured directly in advertisements of Daniel Defense rifles, including the one used in this massacre. This EOTech site was marketed and sold to Ramos when he was 17 years old.

73. Upon information and belief at no time did EO Tech inquire as to Ramos' age.

74. Defendants knew or should have known that their social media advertising contains content that is not suitable for all audiences, but did nothing to keep it from reaching would-be perpetrators of violence like Ramos. Ramos was known to be active on Instagram where these advertisements would routinely appear.

b. **Defendants' Ads Promote Activity that Is or May Be Illegal**

75. Despite some content moderation on social media sites, Defendants Daniel Defense, Firequest, EO Tech and Flash and others have been undeterred from advertising their products in connection with activity that is or may be illegal in some or all jurisdictions— without any regard to where the consumer is viewing the ad from. This content, too, appeals to the thrill-seeking impulses of young men like Ramos.

76. In an Instagram ad published just over two months before the shooting, Defendant Daniel Defense promoted imagery of a rifle with a rifle scope on a rooftop, targeting a car on a public street. An Instagram user asked, in response to the post titled "Rooftop Ready": "Is this an assassins setup? And can I buy this?" Daniel Defense's official account's response was to

25

suggest that "anyone" could use this "assassin's setup": "More geared toward MIL/LE but adaptable to anyone. Yes, our Delta 5 Pro 16" is live on our site right now!" (MIL/LE is a reference to military and law enforcement).

77. Defendants Firequest and Flash Co. advertised their Hellfire product to increase the number of bullets that a weapon can fire with a pull of the trigger without informing consumers that such a product would likely make their weapon a machine gun.

78. Federal law defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

79. Machine guns are strictly regulated by federal law. Under 18 U.S.C. § 922(b)(4), it is illegal for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver a machine gun to any individual, corporation or company unless specifically authorized to do so by the Attorney General.

80. Similarly, Texas Penal Code § 46.05(a) makes it a criminal offense to possess, manufacture, transport, repair, or sell a machinegun.

81. From the time that it began manufacturing, marketing, or selling the Hell-Fire Gen 2 snap-on trigger system, and continuously thereafter, Firequest and Flash Co knew that the Hell-Fire Gen 2 snap-on trigger system allows the user to unleash automatic fire through a single pull of the trigger, and therefore is a machinegun under federal and Texas law.

82. Of course, Ramos was drawn to the Hell-Fire Gen 2 snap-on trigger system precisely because Firequest and FlashCo promoted it as a machinegun. Ramos was exposed to Firequest's and Flash

26

Copy from re:SearchTX

Co's marketing for the Hell-Fire Gen 2 snap-on trigger system on the internet purchased a Hell-Fire Gen 2 snap-on trigger system after being exposed to that marketing.

83. Additionally, Daniel Defense's marketing encourages fully automatic fire and repeatedly shows individuals firing Daniel Defense AR-15s in full-auto. In these advertisements, Daniel Defense promotes automatic firing of its assault rifles through messages like, "Happy #fullautofriday everyone!!! 🤙🤘"; "There's nothing better than a Mk18 with a fun switch!"; "Today's #fullautofriday is brought to you by the DDM4V7 .300 BLK"; and "Ringin' in #fullautofriday with a suppressed MK18! 🎯". Daniel Defense promotes automatic fire of its weapons to civilians even though it knows that it is illegal for civilians to possess a machinegun.

84. By purchasing the Hell-Fire Gen 2 snap-on trigger system, the Shooter gained the ability to illegally unleash fire at an automatic rate-of-speed from his DDM4v7, just like the shooters in Daniel Defense's videos.

    **c. Defendants Knew that Adolescents and Young Adults Are Prone to Risky and Thrill-Seeking Behavior**

85. Defendants knew or should have known of the risks of their deceptive marketing and related conduct, as the growing numbers of mass shootings involving assault rifles each year. From January 2012 through July 2022, 70 percent of the 10 mass shootings with the highest counts of gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 18 and 26.

86. It is well known that adolescent and young men between the ages of 15 and 24 are highly susceptible to product advertising and more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior.

87. Defendants' deceptive marketing targets and exploits this demographic by promoting

Copy from re:SearchTX

advertising that is specifically appealing to—and encouraging of—this group's propensities for violent behavior.

88. Their advertisements expressly and directly state to these young men that they can be a solider and with these weapons, ammunition and accessories they can kill the maximum number of people.

89. Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood.

90. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.

91. Adolescents and young men are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.

92. Negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

93. Studies have further shown that this predilection for risky, thrill-seeking behavior extends to violent criminal behavior. A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24. And as discussed above, adolescents and young men disproportionately represent the demographic of the most destructive mass shooters. As the makers of assault rifles, rifle accessories, and ammunition that have been used in mass shootings, Defendants are aware that these age groups are more likely to engage in risky, thrill-seeking, violent, and impulsive behavior.

94. Despite this knowledge, Defendants continued marketing their weapons, accessories, and ammunition in a manner that would appeal to thrill-seeking young men who crave the power and

28

destruction of a military weapon and all of its accessories, fully knowing and appreciating that the growth of their product lines was due in part to their appeal to a younger demographic of users. Defendants' marketing and advertising therefore foreseeably led to the mass shooting at the Robb Elementary School.

95. Each Defendant amassed a following on social media to promote their products. None restricted their product-promoting posts to their followers. To the contrary, Defendants used hashtags to connect with those who were not already following them and to target consumers.

96. Defendants Daniel Defense, Firequest, EO Tech and Flash marketing of assault rifles, ammunition and accessories and worked as intended on Ramos, leading him to tell others that he would do something that would make him famous.

97. It is clear that Ramos purchased Defendants' products to create customized weapons of war for use in this rampage.

98. Defendants' negligent, deceptive and unfair marketing acts and practices increased the level of violence of the rampage by putting in Ramos' hands deadly weapons, accessories, and ammunition that he thought were together designed for mass death.

99. This negligent advertising is in violation of the Federal Trade Commission. The FTC establishes a duty on these Defendants to not engage in materially deceptive advertising of their products. This duty is there to protect individuals including these Plaintiffs. By engaging in advertising these Defendants agreed to assume this duty not to engage in deceptive, negligent or misleading advertisements.

100. These Defendants failed to act reasonably in their advertising and violated FTC regulations through their advertising of these products.

101. These Defendants manufactured, marketed and sold these products. In relation to the rifle

Copy from re:SearchTX

purchases the Defendant Oasis Outback acted as the agent for Daniel Defense to complete the purchase. The Defendant Oasis Outback further sold to Ramos directly some of the ammunition that he used. Oasis outback additional installed a scope on one of the rifles he purchased.

102. Ramos purchased these products as a result of these advertisements and used these products in his mass shooting.

**CAUSE OF ACTION I AGAINST ALL
DEFENDANTS**

103. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

104. Defendant Daniel Defense, Firequest, EO Tech and Flash (Defendants) advertised and offered to sell these products to Texas residents including Ramos.

105. Defendants Facebook, Instagram, Twitter and other advertising pre-dating the shooting, including but not limited to the advertising cited herein, contained one or more representations that were materially untrue, deceptive, or misleading. Defendant Daniel Defense, LLC untruthfully, deceptively, or misleadingly promoted its weapons as suitable for war and civilian use, beneficial to safety and security, capable of safe handling by children, and/or appropriate for uses that are or may be illegal in some or all U.S. jurisdictions.

106. Defendants Facebook, Instagram, Twitter and other advertising posts were made with the intent to sell or to induce the public to purchase their products.

107. These negligent acts and or omissions included but are not limited to the following:

    a. Offering, marketing and encouraging the purchase and use of their products by individuals under the age of 18;

    b. Marketing their products as weapons of war when they knew or should have known that these products would be used in this manner on innocent civilians;

    c. Failing to assure that those they are marketing to and selling their products to are over the age of 18;

Copy from re:SearchTX

    d.  Failing to have an age limitation on its online stores which allow those under the age of 18 to view and ultimately purchase their products

    e.  Ultimately selling their products to Ramos through these negligent acts as described herein.

108. Defendants' products were used in the massacre which led to the deaths and injuries to these Plaintiffs.

109. The Plaintiffs have sustained damages as a result of the harmful use of Defendants products as described herein. Thus, these negligent acts of these Defendants were the proximate cause of the damages complained of herein.

110. Further, the Plaintiffs would hereby allege that these claims against these defendants are not prohibited due to the immunity provided in the Protection of Lawful Commerce in Arms Act, 15 U.S.C. Sec. 7902. The violation of the FTC regulations and the otherwise deceptive marketing of these products make these sales exempt from immunity allowed for under this act.

111. Pleading further, because the offer to sell, the marketing of these products were in violation of Texas Penal Code 46.05 (a), 46.06 (a)(2) and 18 U.S.C. Sec. 922(b)(4) these Defendants are not immune from suit pursuant to 15 U.S.C. Sections 7901-7903.

112. Pleading further, the Plaintiffs would hereby allege that the Defendant Oasis Outback at all times relevant herein acted as the agent for Daniel Defense.

## CAUSE OF ACTION  II
### Products Liability and  Negligence of Daniel Defense Firequest and Flash Co.

113. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

114. The Defendant Daniel Defense designed, manufactured and marketed the rifle used by Ramos in this massacre. Their design allows for trigger modifications such as those designed, manufactured and marketed by Firequest, including the Helfire Gen 2 purchased by Ramos and

31

Copy from re:SearchTX

used in this massacre.

115. The Defendant Daniel Defense is well aware that its design allows for this modification and does nothing to prevent it from being used on its rifles. In addition, it encourages the use of these modifications to their rifles through its advertising and marketing depicting its rifles in military settings where rapid fire would be used and actively advertising that its rifles can be used as automatic weapons.

116. The design of these products and the manner in which they are designed to be used renders them automatic machine guns in violation of 18 U.S.C. Sec. 922(b)(4) and Texas Penal Code Sec. 46.05(a).

117. Firequest and Flash Co. design, manufactures and market the Hellfire Gen 2 to allow for rapid fire, much faster than standard trigger pulls with no legitimate or reasonable purpose or use. As such this product is unreasonably dangerous per se.

118. The negligence of these Defendants as described herein were the proximate cause of the damages to these Plaintiffs.

119. Further, these products were unreasonably dangerously defective in their design, manufacture and marketing. As such these Defendants are strictly liable for the damages caused to these Plaintiffs.

## CAUSE OF ACTION III
## NEGLGENCE PER SE

120. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

121. The actions of these Defendants as described herein constitute negligence per se.

122. The design, manufacture, marketing and selling of these products violate the regulations of the Federal Trade Commission (Plaintiffs do not use this a direct claim for relief under these

Copy from re:SearchTX

regulations but as a predicate statute violation under 15 U.S.C. Sec. 7901-7903), 18 U.S.C. 922

(b)(4), and Texas Penal Code Sections 46.05(a) and 46.06(a)(2).

## GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

123. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

124. The actions of these Defendants were not momentarily thoughtlessness. On the contrary they were deliberate, intentional, malicious and reckless.

125. Viewed objectively from the Defendants standpoint, their acts and omissions whether taken singularly or in any combination, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

126. These Defendants had actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

127. Accordingly, Plaintiffs seek exemplary damages against Defendant Daniel Defense under Texas Civil Practice and Remedies Code § 41.003 et. seq.

128. Further, these actions are such that the limitations for exemplary damages under Sec. 41.008(b) do not apply pursuant to Sec. 41.008(c).

## DAMAGES

## SURVIVING PLAINTIFFS

129. As a direct and proximate result of the incident and the intentional conduct of the Defendants, Plaintiff N.O., a minor, suffered severe and permanent bodily injuries to his shoulder, arm, back and other parts of his body generally. The injuries have had a serious effect on the Plaintiff's health and well-being. These specific injuries and their ill effects have, in turn, caused his physical and mental condition to deteriorate generally and the specific injuries and ill effects have and will, in reasonable probability, cause him to suffer consequences and ill effects of this deterioration

33

Copy from re:SearchTX

throughout his body in the future, if not for the balance of his natural life. The Plaintiff has also suffered great physical and mental pain, suffering and anguish and, in reasonable probability, will continue to suffer in this manner in the future, if not for the balance of his natural life.

130. Additionally, as a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to incur the following damages:

1.  Pain and suffering in the past;
2.  Pain and suffering in the future;
3.  Mental anguish in the past;
4.  Mental anguish in the future;
5.  Past medical expenses;
6.  Future medical expenses;
7.  Physical impairment in the past;
8.  Physical impairment in the future;
9.  Physical disfigurement in the past;
10. Physical disfigurement in the future;
11. Pre judgment interest;
12. Post judgment interest;
13. Exemplary damages;
14. Loss of enjoyment of life in the past; and,
15. Loss of enjoyment of life in the future.

131. As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

132. As a direct and proximate result of the incident and the intentional conduct of the Defendants, Plaintiff K.O., a minor, suffered severe and permanent bodily injuries to her shoulder, back, leg, and other parts of her body generally. The injuries have had a serious effect on the Plaintiff's health and well-being. These specific injuries and their ill effects have, in turn, caused her physical and mental condition to deteriorate generally and the specific injuries and ill effects have and will, in reasonable probability, cause her to suffer consequences and ill effects of this deterioration throughout her body in the future, if not for the balance of her natural life. The Plaintiff has also suffered great physical and mental pain, suffering and anguish and, in reasonable probability, will continue to suffer in this manner in the future, if not for the balance of her natural life.

Copy from re:SearchTX

133. Additionally, as a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to incur the following damages:

1. Pain and suffering in the past;
2. Pain and suffering in the future;
3. Mental anguish in the past;
4. Mental anguish in the future;
5. Past medical expenses;
6. Future medical expenses;
7. Physical impairment in the past;
8. Physical impairment in the future;
9. Physical disfigurement in the past;
10. Physical disfigurement in the future;
11. Pre judgment interest;
12. Post judgment interest;
13. Exemplary damages;
14. Loss of enjoyment of life in the past; and,
15. Loss of enjoyment of life in the future.

134. As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

135. As a direct and proximate result of the incident and the intentional conduct of the Defendants, Plaintiff L.G., a minor, suffered severe and permanent bodily injuries to her face, nose, cheek and other parts of his body generally. The injuries have had a serious effect on the Plaintiff's health and well-being. These specific injuries and their ill effects have, in turn, caused her physical and mental condition to deteriorate generally and the specific injuries and ill effects have and will, in reasonable probability, cause her to suffer consequences and ill effects of this deterioration throughout her body in the future, if not for the balance of her natural life. The Plaintiff has also suffered great physical and mental pain, suffering and anguish and, in reasonable probability, will continue to suffer in this manner in the future, if not for the balance of her natural life.

136. Additionally, as a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to incur the following damages:

1. Pain and suffering in the past;
2. Pain and suffering in the future;
3. Mental anguish in the past;

35

Copy from re:SearchTX

4.   Mental anguish in the future;
5.   Past medical expenses;
6.   Future medical expenses;
7.   Physical impairment in the past;
8.   Physical impairment in the future;
9.   Physical disfigurement in the past;
10.  Physical disfigurement in the future;
11.  Pre judgment interest;
12.  Post judgment interest;
13.  Exemplary damages;
14.  Loss of enjoyment of life in the past; and,
15.  Loss of enjoyment of life in the future.

137. As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

138. As a direct and proximate result of the incident and the intentional conduct of the Defendants, Plaintiff Elsa Avila, suffered severe and permanent bodily injuries to her abdomen and other parts of her body generally. The injuries have had a serious effect on the Plaintiff's health and well-being. These specific injuries and their ill effects have, in turn, caused her physical and mental condition to deteriorate generally and the specific injuries and ill effects have and will, in reasonable probability, cause her to suffer consequences and ill effects of this deterioration throughout her body in the future, if not for the balance of her natural life. The Plaintiff has also suffered great physical and mental pain, suffering and anguish and, in reasonable probability, will continue to suffer in this manner in the future, if not for the balance of her natural life.

139. Additionally, as a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to incur the following damages:

1.   Pain and suffering in the past;
2.   Pain and suffering in the future;
3.   Mental anguish in the past;
4.   Mental anguish in the future;
5.   Past medical expenses;
6.   Future medical expenses;
7.   Physical impairment in the past;
8.   Physical impairment in the future;
9.   Physical disfigurement in the past;
10.  Physical disfigurement in the future;
11.  Pre judgment interest;

36

Copy from re:SearchTX

12. Post judgment interest;
13. Exemplary damages;
14. Loss of enjoyment of life in the past; and,
15. Loss of enjoyment of life in the future.

140.   As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

## **WRONGFUL DEATH PLAINTIFFS**

141.   As a direct and proximate result of the actions these Defendants, J.F., Jr., a minor, lost his life. As

the decedent's father and statutory beneficiary, Plaintiff Jose Flores seeks the following damages:

    a.   Loss of companionship and society sustained in the past: loss of the positive benefit flowing from the love, comfort, companionship, and society that Jose Flores in reasonable probability would have received from J.F., Jr. had he lived;

    b.   Loss of companionship and society that in reasonable probability will be sustained in the future;

    c.   Mental anguish sustained in the past: emotional pain, torment, and suffering experienced by Jose Flores because of the death of J.F., Jr.;

    d.   Mental anguish that in reasonable probability will be sustained in the future;

142.   As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

143. As a direct and proximate result of the actions of these Defendants J.F. jr, lost his life. As

Representative of the decedent's estate, Plaintiff Jose Flores seeks the following damages:

    a.   Pain and mental anguish: the conscious physical pain and emotional pain, torment and suffering experienced by J.F., Jr. before his death as a result of the occurrence in question;

    b.   Funeral and burial expenses;

    c.   Expenses incurred by the decedent in connection with his death;

144. As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

145. As a direct and proximate result of the actions of these Defendants, Irma Garcia lost her life.

Plaintiff Manuel Lozano was her father. Plaintiffs Jose Alejandro Garcia and Lyliana Garcia were

37

Copy from re:SearchTX

her children. Plaintiff Jose Alejandro Garcia is also the representative of the estate of Irma Garcia.

Collectively they seek the following damages:

      a.      Pecuniary loss sustained in the past: loss of the care, maintenance, support, services, advice, counsel and reasonable contributions of a pecuniary value, that A.G. and L.G., minors, in reasonable probability would have received from their mother, Irma Garcia, had she lived;

      b.      Pecuniary loss that in reasonable probability will be sustained in the future;

      c.      Loss of companionship and society sustained in the past: loss of the positive benefit flowing from the love, comfort, companionship, and society that A.G. and L.G. minors, in reasonable probability would have received from their mother, Irma Garcia, had she lived;

      d.      Loss of companionship and society that in reasonable probability will be sustained in the future;

      e.      Mental anguish sustained in the past: emotional pain, torment, and suffering experienced because of the death of Irma Garcia.

      f.      Mental anguish that in reasonable probability will be sustained in the future;

      g.      Loss of inheritance: present value of the assets that the deceased, in reasonable probability would have added to the estate and left at natural death to A,G. and L.G., minors.

      h.      Survivor damages and funeral costs for her estate.

146. As a result, the damages sought are in excess of one million dollars ($1,000,000.00).

## **EXEMPLARY DAMAGES**

147. Plaintiffs hereby incorporates each of the foregoing paragraphs herein as if set

forth in full in this section.

148. Plaintiffs sue for exemplary damages in an amount to be determined by the jury.

## **INTEREST**

149. Plaintiffs seek pre-judgment and post-judgment interest as allowed by law.

## **DEMAND FOR JURY TRIAL**

150. Plaintiffs demand a trial by jury.  Plaintiffs acknowledge payment this date of the required jury fee.

## **NOTICE OF SELF-AUTHENTICATION**

Copy from re:SearchTX

151. Pursuant to RULE 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, Defendants are hereby noticed that the production of any document in response to written discovery authenticates the document for use against that party in any pretrial proceeding or at trial.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court award compensatory and exemplary damages as set out herein, prejudgment and post judgment interest as allowed by law, costs of court and for such other and further relief to which they may show themselves to be justly entitled.

Respectfully submitted,

Law Offices of Thomas J. Henry
5711 University Heights, Suite 101
San Antonio, Texas 78249
Phone: (210)-656-1000
Fax: (877)-513-1359

By: _____
Robert P. Wilson
SBN: 21718575
Rwilson-svc@tjhlaw.com

ATTORNEYS FOR PLAINTIFF

*service by email to this address only

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Robert WILSON on behalf of Robert WILSON
Bar No. 21718575
rwilson-svc@thomasjhenrylaw.com
Envelope ID: 88127616
Filing Code Description: Petition
Filing Description: Plaintiffs' Original Petition
Status as of 5/24/2024 5:01 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert Wilson | | rwilson-svc@tjhlaw.com | 5/24/2024 3:31:09 PM | SENT |